Case 1:06-cv-00825-LSM Document 14 Filed 12/11/2006 Page 1 of 27

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| DISMAS CHARITIES, INC., Plaintiff, v. THE UNITED STATES, Defendant. | AGREED-UPON REDACTED COPY – MAY BE MADE PUBLIC<br>**Filed Under Seal**<br>No. __________<br>BID PROTEST |

**PLAINTIFF DISMAS CHARITIES, INC.'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR A**
**PRELIMINARY INJUNCTION AGAINST UNLAWFUL AWARD OF CONTRACT**

Alex D. Tomaszczuk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7940
Fax: (703) 770-7901

*Counsel of Record for Plaintiff*
*Dismas Charities, Inc.*

*Of Counsel:*

Daniel S. Herzfeld
Orest J. Jowyk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7900

Dated: December 4, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

QUESTION PRESENTED ..... 2

STATEMENT OF THE CASE ..... 3

A. The Solicitation ..... 3

B. BOP's Evaluation and Award Determination ..... 6

C. Dismas's Bid Protest at the Government Accountability Office ..... 8

D. Bannum Never Had and Still Lacks the Required Facility ..... 9

ARGUMENT ..... 9

I. STANDARD OF REVIEW ..... 9

II. UNDER THE TRADITIONAL FOUR-PART TEST, PLAINTIFF DISMAS IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF TO PREVENT BOP FROM PERMITTING BANNUM TO PROCEED WITH CONTRACT PERFORMANCE ..... 10

A. Dismas Is Likely to Prevail on the Merits of This Procurement Protest Case ..... 10

1. BOP Misevaluated Bannum's Technical/Management and Past Performance Proposals ..... 10

a. BOP Unreasonably Failed to Downgrade Bannum's Technical/Management Proposal for not Properly Meeting the Minimum Requirements of the Solicitation Under the Site Validity and Suitability Factor ..... 11

b. BOP Failed To Properly Conduct the Past Performance Evaluation of Bannum ..... 14

2. BOP Failed to Make Award Based on Best Value ..... 16

B. Absent Temporary or Preliminary Injunctive Relief, Dismas Will Suffer Irreparable Harm ..... 18

Case 1:06-cv-00825-LSM Document 14 Filed 12/11/2006 Page 3 of 27

C. The Balance of Hardships Favors Dismas ........................................................ 19

D. Injunctive Relief Will Serve the Public's Interest in Proper Enforcement of Procurement Laws ................................................................ 20

CONCLUSION AND RELIEF REQUESTED ..................................................................... 20

EXHIBITS

1. Austin City Code Section 25-2-491 and Zoning Use Summary Table

2. City of Austin Review Case Summary for 1109 E. 52nd St.

3. Award Notice in Hattiesburg, Mississippi Procurement

Case 1:06-cv-00825-LSM Document 14 Filed 12/11/2006 Page 4 of 27

## TABLE OF AUTHORITIES

Cases

*Advanced Data Concepts, Inc. v. United States*,
216 F.3d 1054 (Fed. Cir. 2000) .......... 14

*Alfa Laval Separation, Inc. v. United States*,
175 F.3d 1365 (Fed. Cir. 1999) .......... 11

*Avtel Servs., Inc. v. United States*,
70 Fed. Cl. 173 (2005) .......... 10

*Bannum, Inc. v. United States*,
69 Fed. Cl. 311 (2006) .......... 15

*Cardinal Maint. Servs., Inc. v. United States*,
63 Fed. Cl. 98 (2004) .......... 18

*CIGNA Government Services, LLC v. United States*,
70 Fed. Cl. 100 (2006) .......... 19

*Delbert Wheeler Constr., Inc. v. United States*,
39 Fed. Cl. 239 (1997), *aff'd*, 155 F.3d 566 (Fed. Cir. 1997) .......... 10

*FMC Corp. v. United States*,
3 F.3d 424 (Fed. Cir. 1993) .......... 10

*Info. Scis. Corp. v. United States*,
2006 U.S. Claims LEXIS 274 (2006) .......... 18, 19, 20

*LABAT-Anderson v. United States*,
65 Fed. Cl. 570 (2005) .......... 20

*Mangi Envtl. Group, Inc. v. United States*,
47 Fed. Cl. 10 (2000) .......... 11

*OTI America, Inc. v. United States*,
68 Fed. Cl. 646 (2005) .......... 18

*Overstreet Elec. Co., Inc. v. United States*,
47 Fed. Cl. 728 (2000) .......... 18

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004) .......... 18, 19, 20

Case 1:06-cv-00825-LSM Document 14 Filed 12/11/2006 Page 5 of 27

*SAI Indus. v. United States*,
60 Fed. Cl. 731 (2004) .......... 18

*Vantage Associates, Inc. v. United States*,
59 Fed. Cl. 1 (2003) .......... 15

*Zenith Radio v. United States*,
710 F.2d 806 (Fed. Cir. 1983) .......... 10

Comptroller General Decisions

*For Your Info., Inc.*,
B-278352, Dec. 15, 1997, 97-2 CPD ¶ 164 .......... 11

*GTS Duratek, Inc.*,
B-280511.2, B-280511.3, Oct. 19, 1998, 98-2 CPD ¶ 130 .......... 15

*Int'l Bus. Sys., Inc.*,
B-275554, Mar. 3, 1997, 91-1 CPD ¶ 114 .......... 15

Statutes and Regulations

28 U.S.C. § 1491(b)(4) .......... 10

48 C.F.R. § 15.506(d) .......... 8

48 C.F.R. § 15.308 .......... 2, 16, 17

Austin City Code § 25-2-6 (45) .......... 12

Austin City Code § 25-2-491 and Zoning Use Summary Table .......... 12

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| DISMAS CHARITIES, INC., Plaintiff, v. THE UNITED STATES, Defendant. | PROPOSED REDACTED COPY<br><br>**Filed Under Seal**<br>No. ___________<br><br>BID PROTEST |

**PLAINTIFF DISMAS CHARITIES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION AGAINST UNLAWFUL AWARD OF CONTRACT**

**INTRODUCTION**

In this post-award bid protest action, Plaintiff Dismas Charities, Inc. ("Dismas"), pursuant to RCFC 65, seeks preliminary injunctive and declaratory relief to enjoin the Department of Justice, Federal Bureau of Prisons ("BOP") from permitting awardee Bannum, Inc. (Bannum"), to proceed with performance of Contract No. DJB200811 (the "Contract") awarded by BOP, under Request for Proposals No. 200-0861-SC ("RFP" or the "Solicitation").

The procurement is for Community Sanctions Center ("CSC") services for Federal offenders held under the authority of United States statutes in Austin, Texas, and the Contract is valued at up to $5.6 million over five years (a two-year base period and three one-year option periods). BOP awarded the Contract using a negotiated procurement format subject to 48 C.F.R. part 15 and the Solicitation required BOP to make award to the offeror that provided the "best value" to BOP.

BOP violated law and regulation in basing its award decision on flawed technical and past performance evaluations, which failed to recognize that Bannum failed to timely meet

mandatory evaluation criteria under the Technical/Management evaluation factor, and which did not consider important past performance information that was simply "too close at hand" to ignore.

In addition, as an independent ground for overturning the award, BOP improperly based its award decision on a purported tradeoff analysis that was arbitrary, capricious, and contrary to law because it failed to make the comparative assessment required by the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 15.308. Such an assessment would have shown that Dismas's higher technically rated and only moderately more expensive proposal represents the best value in this procurement, which was heavily weighted in favor of the technical and past performance evaluation factors rather than price. By failing to perform a proper tradeoff analysis, or even to recognize the different weightings that the RFP assigned to the technical and the past performance evaluation factors, the agency deviated from the source selection criteria and effectively converted the procurement from a best value/tradeoff procurement into one for the lowest-cost, technically-acceptable, proposal. Furthermore, the agency's purported tradeoff analysis could not have been rational, as the purported analysis did not even take into account Bannum's failure to meet not one, but two mandatory minimum requirements of the Solicitation. Stated differently, BOP changed the ground rules at the last minute to take advantage of perceived cost savings available from an offeror that was technically "acceptable."

## QUESTION PRESENTED

Whether Plaintiff Dismas is entitled to preliminary injunctive relief to prevent BOP from permitting awardee Bannum from proceeding with work on the unlawfully awarded contract.

## STATEMENT OF THE CASE

### A. The Solicitation

The Solicitation was for BOP's procurement of CSC services for Federal offenders held in Austin, Texas under the authority of United States statutes. RFP, Cover Letter. The Solicitation indicated that BOP would award a single Indefinite Delivery/Requirements-type contract with firm-fixed unit-prices ("inmate day rates") for a two-year base period and three one-year options to the responsible offeror whose proposal represented the best value to the Government after evaluation in accordance with the evaluation factors and subfactors in the Solicitation. RFP §§ B.1., L.1.(f)(1), and L.2. The resulting contract was to be for 55 beds during the base period, increasing to 58 beds in the final option year. *See* RFP § B.1(a). The Solicitation required offerors to submit a Technical/Management Proposal, a Business Proposal, and Past Performance information. RFP § L.5. The due date for initial proposal submissions was July 14, 2005. RFP, Amendment 0001.

According to the Solicitation, if discussions were required in the course of the procurement, each offeror had to "provide the Contracting Officer with valid proof of all zoning and local ordinance requirements necessary for the operation of" the offeror's proposed facilities used to perform the work. RFP § L.6.(i). Each offeror was to provide such proof to the Contracting Officer "**within sixty days after the date of the initial proposal submission**." *Id.* (emphasis in the original).

The Past Performance information was to "address all elements contained in the CCC/CSC/MINT Compliance Matrix" ("Matrix") in the Solicitation's Section J. RFP § L.8. The Matrix required the offeror to submit "[t]he 5 most relevant contract and/or subcontracts that were, or are currently being, performed in the past 3 years." RFP Matrix, Accountability Factor, Proposal Preparation Instructions at 1. The Matrix also required that the offeror "submit

information on problems encountered on the contracts and/or subcontracts identified and the corrective actions taken to resolve the issues." *Id.* at Note.

The Solicitation stated that BOP would award to the offeror whose proposal the Government determined to be in the Government's best interests, "price and other factors considered." RFP § M.2. The Solicitation identified the "other factors" as:

> (A) The offeror's compliance with those minimum standards prerequisite to an affirmative determination of responsibility as defined by Section 9.104-1 of the Federal Acquisition Regulation.
>
> (B) The offeror's compliance with **minimum or mandatory technical/management requirements** to the extent specified in the Terms and Conditions and/or specifications contained in this solicitation.
>
> (C) All factors at M.5 below, upon which a comparative rating of proposals will be based, in accordance with the relative order of importance accorded each respectively.

RFP § M.2. (emphasis added).

Section M.5. of the Solicitation identified three Evaluation Criteria, in order of importance: (1) Past Performance; (2) Technical/Management; and (3) Price. RFP § M.5. The Solicitation stated that the Technical/Management and Past Performance evaluation criteria, when combined, were "significantly more important that Price." *Id.*

The Solicitation stated that a Source Selection Evaluation Board ("SSEB") would analyze each Technical/Management Proposal, rating each element and "giving the highest rating to the best overall approach." RFP § M.3. The Solicitation listed five evaluation factors for the Technical/Management area: (1) Site Location, composed of two subfactors, Site Validity and Suitability, and Community Outreach Program; (2) Accountability; (3) Programs; (4) Facility; and (5) Personnel. RFP § M.5., 2.0. The Solicitation stated: "**Site Location is the most important Technical/Management factor**." *Id.* (emphasis added).

The Solicitation stated that the Past Performance evaluation would be "accomplished by reviewing aspects of an offeror's relevant present and recent past performance, focusing on and targeting performance that is relevant to the Past Performance factors" outlined in the Solicitation. RFP § M.5., 1.0.

As for price, the Solicitation stated that the Government would not "specifically score or rate the offeror's price." RFP § M.5., 3.0. The Solicitation stated that the offeror's evaluated price would be "assessed against the evaluation results of the Non-Price areas in conducting possible tradeoff analysis and determining the best value to the Government." *Id.*

The Solicitation stated that the Government would also conduct a proposal risk assessment. RFP § M.5., Risk Assessment Area. Separate proposal risk assessments and ratings could be applied to all of the evaluation criteria, except for the "Site Validity and Suitability" subfactor under the Technical/Management Evaluation Area. *Id.* For that subfactor, the Solicitation stated that "the level of risk associated with the offeror's proposal is inherent in the subfactor definition and will thus be reflected in the subfactor color/adjectival rating and rationale." *Id.*

The evaluation's color/adjectival ratings were defined in the Solicitation as follows:

> BLUE – Very Good: Offeror's proposal meets and exceeds the requirements of the solicitation. Their proposal shows they have a very good solution for meeting the needs and objectives of the program. One or more significant strengths exist. Weaknesses may exist, but none are considered significant and are easily correctible.
>
> GREEN – Acceptable: Offeror's proposal **meets the solicitations minimum requirements** of the solicitation [sic]. Their proposal shows they have an acceptable solution for meeting the needs and objectives of the program. Strengths and weaknesses may exist. The weaknesses are correctable.
>
> YELLOW – Poor: Offeror's proposal does not meet some of the requirements of the solicitation. Their proposal shows they have a poor solution for meeting the needs and objectives of the

> program. Weaknesses outweigh any strengths that may exist. The weaknesses are difficult to correct.
>
> RED – Unacceptable: Offeror's proposal fails to meet the requirements of the solicitation. Their proposal shows they have an unacceptable solution for meeting the needs and objectives of the program. There are numerous weaknesses. The weaknesses will be very difficult to correct or are not correctable.

RFP § M.5. (emphasis added).

**B. BOP's Evaluation and Award Determination**

BOP received three proposals by the closing date. Source Selection Decision ("SSD") at 1. Dismas's timely submitted proposal to BOP addressed each of the evaluation factors and subfactors in detail, and provided BOP with all of the information requested in the Solicitation, without taking any exception to any of the Solicitation's terms, conditions, or requirements.

BOP evaluated the proposals and found all three to be in the competitive range. *Id.* BOP conducted two rounds of discussions, after which each offeror submitted its final proposal revision. *See id.* at 2. On February 2, 2006, Sheila Makle, the Source Selection Official ("SSO"), decided to make contract award to Bannum. SSD at 14. On March 28, 2006, BOP announced that it had awarded the Contract to Bannum. *See* Notice to Unsuccessful Offeror, March 28, 2006. On that same date, Rebecca Canfield, the Contracting Officer, signed the Contract on behalf of the Government. Award Documentation, page 1. Contract performance was to begin on September 1, 2006. *Id.*

According to BOP's Debriefing Letter, final proposed inmate day rates for Dismas and Bannum for CSC services were as follows:

| | Base Period | Option Year 1 | Option Year 2 | Option Year 3 |
|---|---|---|---|---|
| **Dismas** | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| **Bannum** | $59.00 | $52.00 | $53.00 | $54.00 |

Case 1:06-cv-00825-LSM Document 14 Filed 12/11/2006 Page 12 of 27

According to the SSD, the Government's independent government estimate ("IGE") for the Contract was $[redacted]. SSD at 1. All three offerors submitted final proposal revisions with overall total amounts lower than the IGE. *Id.* Dismas's overall total amount was $[redacted], while Bannum's overall total amount was $5,680,820.00. *Id.* BOP's overall evaluation and risk level ratings for Dismas and Bannum were as follows for each of the evaluation factors and subfactors:

| | **DISMAS** | **BANNUM** |
|---|---|---|
| PAST PERFORMANCE | BLUE | BLUE |
| TECHNICAL/MANAGEMENT | BLUE/VERY GOOD | GREEN/ACCEPTABLE |
| Site Location<br>*Site Validity and Suitability*<br>*Community Relations Program* | Blue/Very Good<br>*Green/Acceptable*<br>*Blue/Very Good* | Green/Acceptable<br>*Green/Acceptable*<br>*Blue/Very Good* |
| Accountability | Blue/Very Good | Green/Acceptable |
| Programs | Green/Acceptable | Green/Acceptable |
| Facility | Green/Acceptable | Green/Acceptable |
| Personnel | Blue/Very Good | Green/Acceptable |
| TECHNICAL/MANAGEMENT FINAL SCORE | BLUE/VERY GOOD<br>LOW RISK | GREEN/ACCEPTABLE<br>LOW RISK |

SSD at 8-13.

As noted above, under the Site Validity and Suitability evaluation subfactor, Bannum received a GREEN color/adjectival rating. *Id.* at 9. For this subfactor, the SSD noted one weakness, "inadequate parking for staff/inmates, specifically, six spaces are not enough. **Other than the parking issue, they met the minimum requirements** of the solicitation in this subfactor." Id. (emphasis added). The Pre-Site Facility Inspection of Bannum and the SSEB Technical Evaluation also state that Bannum failed to meet this minimum requirement. Pre-Site Facility Inspection of Bannum ("parking is not adequate for both the staff and residents, there are 6 parking slots and 2 of these slots are going to have to be converted to handicap parking."); SSEB Technical Evaluation ("As noted during the pre-site inspection, there was inadequate

parking for staff/inmates, specifically, six spaces are not enough. Other than the parking issue, [Bannum] met the minimum requirements of the solicitation in this subfactor.").

Notwithstanding Bannum's failure to meet the minimum requirements of the Solicitation, the SSD concluded by stating: "Bannum's proposal met the requirements of the SOW" in Past Performance and Technical/Management. SSD at 13-14. Based on this conclusion, while pointing out that Dismas's "Technical/Management proposal was rated higher than the other offerors," the SSO maintained simply that Bannum's "price is fair and reasonable," and stated that the "proposal submitted by Bannum is the best value to the government." *Id.* at 14; *see also* Debriefing Letter at 2, 3, (noting that "Bannum received a high rating in past performance, was technically acceptable and offered a lower price," and "no tradeoffs used in determining the award of the contract").[1]

**C. Dismas's Bid Protest at the Government Accountability Office**

On June 5, 2006, Dismas timely filed a bid protest at the Government Accountability Office ("GAO") challenging the award to Bannum and requesting that BOP stay the contract award pursuant to the automatic stay provision of the Competition in Contracting Act. GAO thereafter notified BOP of the protest and triggered the automatic stay.

In its GAO protest (B-298390), Dismas challenged BOP's failure to follow the evaluation criteria in evaluating proposals under the Technical/Management and Past Performance Evaluation Areas and BOP's failure to make award based on the best value.

[1] In its Debriefing Letter, BOP failed to provide Dismas with the minimum information required by 48 C.F.R. § 15.506(d). For example, while BOP stated three proposals were submitted, it did not include an "overall ranking of all offerors . . .," nor did it include any information about the third offeror. 48 C.F.R. § 15.506(d)(3). Furthermore, BOP failed to provide the overall evaluated cost or price for Dismas and Bannum. *See* 48 C.F.R. § 15.506(d)(2).

On August 21, 2006, GAO denied Dismas's protest on the ground that the evaluation and award decision were reasonable and consistent with the Solicitation's evaluation terms.

**D. Bannum Never Had and Still Lacks the Required Facility**

Although contract performance was to have begun on September 1, 2006, and the GAO protest was decided prior to that date, Bannum has not yet begun contract performance. Upon information and belief, Bannum's failure to begin contract performance stems directly from its failure to meet the mandatory minimum requirements of the Solicitation relating to parking and zoning, and its failure to actually purchase a site, rather than merely lease a site. [redacted].

None of this would have occurred had BOP properly evaluated the proposals, especially in the area of risk assessment, which BOP itself stated was to be evaluated as an inherent part of the Site Validity and Suitability evaluation subfactor.

## ARGUMENT

**I. STANDARD OF REVIEW**

In determining whether to grant Dismas preliminary injunctive relief, the Court must consider four factors:

(1) whether Dismas is likely to prevail on the merits;

(2) whether Dismas is likely to suffer irreparable harm absent temporary and preliminary injunctive relief;

(3) whether granting such relief would substantially harm the government or any other parties;

(4) whether granting such relief would serve the public interest.

Case 1:06-cv-00825-LSM Document 14 Filed 12/11/2006 Page 15 of 27

*Zenith Radio v. United States,* 710 F.2d 806, 809 (Fed. Cir. 1983); *Delbert Wheeler Constr., Inc. v. United States,* 39 Fed. Cl. 239, 251 (1997), *aff'd,* 155 F.3d 566 (Fed. Cir. 1997).

No one factor is dispositive, as any weakness in the showing with respect to one factor may be overborne by the strength of others. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

## II. UNDER THE TRADITIONAL FOUR-PART TEST, PLAINTIFF DISMAS IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF TO PREVENT BOP FROM PERMITTING BANNUM TO PROCEED WITH CONTRACT PERFORMANCE

### A. Dismas Is Likely to Prevail on the Merits of This Procurement Protest Case

Dismas is likely to prevail on the merits of its claims that the procuring agency's underlying evaluation of Bannum's Technical/Management and Past Performance proposals and its source selection decision were arbitrary, capricious, or otherwise not in accordance with law.

Generally, the protester must show by a preponderance of the evidence that the agency's actions either lacked a rational basis or violated applicable procurement law. *See, e.g., Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 183-84 (2005); *see also* 28 U.S.C. § 1491(b)(4) (citing the standard in 5 U.S.C. § 706 to review the agency's decision). BOP failed to conduct a proper evaluation of Bannum's technical and past performance proposals and BOP failed to properly conduct a source selection decision. BOP's actions lacked a rational basis, violated procurement law, and contradict the Solicitation.

#### 1. BOP Misevaluated Bannum's Technical/Management and Past Performance Proposals

In this procurement, BOP failed to evaluate proposals consistent with the Solicitation's evaluation criteria. Bannum's lack of valid proof of zoning requirements and failure to meet the Solicitation's minimum requirement for parking spaces should have resulted in a YELLOW or RED rating under the Technical/Management evaluation area, rather than the GREEN rating

assigned by BOP. Under the Past Performance evaluation area, Bannum's documented record of problematic performance on recent and relevant contracts should have resulted in, at best, a GREEN rating in this area.

**a. BOP Unreasonably Failed to Downgrade Bannum's Technical/Management Proposal for not Properly Meeting the Minimum Requirements of the Solicitation Under the Site Validity and Suitability Factor**

Generally, when an offeror fails to meet the minimum material requirements of a Solicitation, then its offer is noncompliant and should not be eligible for award. *See generally Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367-68 (Fed. Cir. 1999) (finding that awardee failed to meet a Solicitation requirement and finding it noncompliant); *see also Mangi Envtl. Group, Inc. v. United States*, 47 Fed. Cl. 10, 17 (2000) ("[W]here a proposal is not compliant with the mandatory technical requirements of the solicitation, the proposal is unacceptable for award . . . ."); *For Your Info., Inc.*, B-278352, Dec. 15, 1997, 97-2 CPD ¶ 164, at 3 ("In a negotiated procurement, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award.").

Bannum failed to meet the minimum material requirements of the Solicitation when it failed to timely and properly provide valid proof of having met all zoning and local ordinance requirements necessary to operate its proposed facility, as required by the Solicitation's Site Location factor – the most important of the Technical/Management factors. Additionally, Bannum proposed a site lacking the minimum number of parking spaces.

The Solicitation emphasized that, in the event of discussions, all offerors were required to provide BOP with valid proof of having met "all zoning and local ordinance requirements necessary for the operation of Community Corrections Center, Comprehensive Sanctions Center,

Case 1:06-cv-00825-LSM Document 14 Filed 12/11/2006 Page 17 of 27

or any other program as specified in the Statement of Work applicable to any and all proposed performance sites, **within sixty days after the date of the initial proposal submission**." RFP § L.6.(i) (emphasis in the original).

The "Certificate of Occupancy" proffered by Bannum as the documentation required by the Solicitation as valid proof of all zoning and local ordinance requirements did not, under the Austin City Code, fulfill Bannum's zoning requirement to have a Conditional Use permit to operate its proposed facility.

The Solicitation required offerors to provide proposals for "residential Comprehensive Sanctions Center Services (CSC)." RFP, Cover Letter at ¶ 1. According to the Austin City Code, this use clearly qualifies as a transitional housing use:

> TRANSITIONAL HOUSING use is the use of a site for the supervision or detention of more than 15 residents who are making the transition from institutional to community living. This use includes pre-parole detention facilities and halfway houses for juvenile delinquents and adult offenders, and overnight shelters for the homeless.

Austin City Code § 25-2-6 (45). In order to comply with Austin's zoning and local ordinances, transitional housing in a commercially zoned area in Austin cannot operate without a Conditional Use permit. *See* Austin City Code Section 25-2-491 and Zoning Use Summary Table at page 3 (Exhibit 1). Bannum did not receive the required Conditional Use permit for its proposed facility until April 18, 2006, nearly one year after the due date for initial proposal submission (July 14, 2005). *See* City of Austin Review Case Summary for 1109 E. 52nd St. (Exhibit 2).[2]

[redacted]. [redacted]

[2] Notably, Bannum's application for a Conditional Use permit requests the permit for a facility of only 40 beds. The Solicitation required a minimum of 55 beds in the base period.

[redacted]

The Solicitation also required the offeror's facility to provide a number of parking spaces sufficient to meet the needs of the projected staff and inmate population.

BOP admitted in the SSEB Technical Evaluation and in the SSD that Bannum had not met the minimum requirements of the Solicitation concerning parking spaces. In the SSD, BOP stated that, due to inadequate parking, Bannum's proposal did not meet the "minimum requirements of the solicitation" in the Site Validity and Suitability evaluation subfactor. SSD at 9 ("*Other than the parking issue*, they met the minimum requirements of the solicitation in this subfactor) (emphasis added); *see also* Pre-Site Facility Inspection of Bannum ("parking is not adequate for both the staff and residents, there are 6 parking slots and 2 of these slots are going to have to be converted to handicap parking."); SSEB Technical Evaluation ("As noted during the pre-site inspection, there was inadequate parking for staff/inmates, specifically, six spaces are not enough. Other than the parking issue, [Bannum] met the minimum requirements of the solicitation in this subfactor.").

According to the Solicitation, a GREEN rating indicates that the offeror's proposal met the Solicitation's minimum requirements. RFP § M.5. A YELLOW rating indicates that the offeror's proposal did not meet some of the requirements of the Solicitation. *Id.* A RED rating indicates that the offeror's proposal failed to meet the requirements of the Solicitation. *Id.* Based on its failure to meet even one (parking spaces), much less two (parking spaces and valid proof of zoning) minimum material requirements of the Solicitation, BOP should have eliminated Bannum from the competition. At the very least, BOP should have significantly downgraded Bannum's rating under the Technical/Management factor. In this regard, BOP's

Solicitation emphasized that "Site Location is the most important Technical/Management [evaluation] factor." RFP § M.5., 2.0.

In addition, the Site Validity and Suitability evaluation subfactor under the Site Location evaluation factor was the one area where BOP itself recognized that "the level of risk . . . is inherent in the subfactor definition and will thus be reflected in the subfactor color/adjectival rating." RFP M.5. In not reflecting Bannum's failure to meet not one, but two mandatory minimum evaluation criteria under this one subfactor but still assigning Bannum a GREEN (rather than the proper YELLOW or RED) rating, BOP did not follow the evaluation criteria in recognizing the risk inherent in this subfactor.

Dismas was prejudiced by BOP's improper evaluation of Bannum under the Technical/Management factor. *See Advanced Data Concepts v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (noting prejudice shown where, but for agency's errors, "there was a reasonable likelihood that [it] . . . would have been awarded the contract") (quotation and citation omitted). Had BOP eliminated Bannum's proposal from the competition, Dismas would have received the award of the Contract as the next-lowest priced offeror with the highest overall rated proposal. At the very least, had BOP properly rated Bannum's proposal consistent with the evaluation (but not eliminated Bannum from the competition), the proper scoring would have increased the disparity between Dismas's superior proposal and Bannum's proposal.

#### b. BOP Failed To Properly Conduct the Past Performance Evaluation of Bannum

Based on Bannum's past performance on BOP contracts similar in scope and size to the procurement at issue here, Bannum should have received, at best, a GREEN rating in the Past Performance evaluation rather than the BLUE rating it received.

In certain limited circumstances, information concerning an offeror's past performance not provided by the offeror in the course of a solicitation is "simply too close at hand" to be ignored by the agency conducting the evaluation. *Vantage Associates, Inc. v. United States*, 59 Fed. Cl. 1, 21 (2003); *GTS Duratek, Inc.*, B-280511.2, B-280511.3, Oct. 19, 1998, 98-2 CPD ¶ 130; *see also Int'l Bus. Sys., Inc,* B-275554, Mar. 3, 1997, 91-1 CPD ¶ 114, at 5. Where an agency did not, but should have, considered the offeror's performance on a prior contract, GAO has determined that the negative information, even though not required by the Solicitation and not submitted by the offeror, should have been considered by the agency in its evaluation of the offeror. *See GTS Duratek*, 98-2 CPD ¶ 130 at 15.

Individual BOP employees involved in this Solicitation were involved in administering recent and relevant contracts with Bannum where Bannum compiled demonstrably negative performance records, thus satisfying the criteria of the "too close at hand" doctrine. Rebecca Canfield, the Contracting Officer for this procurement and one of the signatories to the Agency Report's Memorandum of Law in the GAO protest, was also the Contracting Officer for one of the procurements involved in *Bannum, Inc. v. United States*, 69 Fed. Cl. 311, 316 (2006) ("[T]he administrative record contains the justifications for the CEF scores that the BOP gave to [Bannum], including a failure to alert the BOP of an escaped prisoner in a timely manner.") (discussing past performance from Hattiesburg, Mississippi procurement that Dismas won); *see also* Award Notice for Hattiesburg, Mississippi Contract (Exhibit 3) naming Rebecca Canfield as the contact for the award). Through her involvement in that procurement, she had knowledge of Bannum's negative past performance on those contracts.

Based on Bannum's past performance on BOP contracts similar in scope and size to the procurement at issue here, known to the Contracting Officer for this procurement, Bannum

should have received, at best, a GREEN rating in the Past Performance evaluation area (rather than the BLUE rating it received). The negative information regarding Bannum's past performance on prior contracts with BOP was "simply too close at hand" for a specific agency employee, the Contracting Officer, to ignore in BOP's evaluation in this procurement.

Dismas was prejudiced by BOP's failure to properly evaluate Bannum's proposal under the Past Performance factor. But for BOP's improper evaluation, Dismas had a substantial chance of being awarded the Contract.

**2. BOP Failed To Make Award Based On Best Value**

Contrary to 48 C.F.R. § 15.308[3] and the source selection criteria set forth in the RFP, BOP failed to conduct an adequate price/technical tradeoff "best value" analysis. By failing to do so, BOP effectively converted this best value, tradeoff procurement – heavily weighted in favor of, first, technical excellence; second, past performance; and only then price – into a lowest-cost, technically-acceptable procurement.

In this procurement, BOP clearly acted improperly by concluding that Bannum should be awarded the Contract. Dismas received the highest ranking in the two most important evaluation areas. While the SSD states that "the proposal submitted by Bannum is the best value to the government" (SSD at 14), BOP admitted in the Debriefing Letter and again in its Agency Report Memorandum of Law that it did not use any tradeoffs in awarding the Contract to Bannum.

---

[3] FAR 15.308 provides as follows:

> The source selection authority's (SSA) decision shall be based on a *comparative assessment of proposals against all source selection criteria* in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. *The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA*, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision. [Emphasis added.]

BOP's own words show that BOP improperly turned this "best value" procurement into a lowest-cost technically-acceptable procurement. For example, the SSD stated that "Bannum's proposal met the requirements of the SOW in Past Performance, Technical/Management, and their price is fair and reasonable." SSD, page 14. The Solicitation, however, required BOP to accord greater weight to the Technical/Management and Past Performance factors. As noted above, there was a clear distinction between the ratings of Dismas's and Bannum's proposals under Technical/Management factor. Dismas not only received a higher rating for the overall factor, but received higher ratings under three of the five Technical/Management subfactors. The SSO brushed these distinctions aside in awarding the Contract to Bannum without even conducting a tradeoff analysis.

In addition, BOP's SSO conducted a flawed best value determination and failed to exercise the independent judgment required by 48 C.F.R. § 15.308 and Section M.2. of the Solicitation by, among other actions, awarding the Contract to an offeror that failed to meet all minimum requirements of the Solicitation. In this regard, the SSO's award determination was not rational, because the SSD includes contradictory statements regarding whether Bannum actually met the minimum requirements of the Solicitation in regards to parking spaces, and completely ignores Bannum's failure to provide the required Conditional Use permit. In the Conclusion of the SSD, the SSO states that "[a]lthough Dismas' Technical/Management proposal was rated higher than the other offerors, they all met the minimum requirements of the SOW." SSD at 13. Yet, earlier in the same SSD, the SSO concluded that Bannum's proposal *did not meet* at least one minimum requirement of the Solicitation. *See* SSD at 9; *see also* SSEB Technical Evaluation at 2 ("as noted during the pre-site inspection, there was inadequate parking for staff/inmates, specifically, six spaces are not enough. Other than the parking issue, [Bannum]

met the minimum requirements of the solicitation in this subfactor."). In the SSO's own words, therefore, Bannum's proposal did not meet the Solicitation's minimum requirement for parking spaces – a minimum requirement in a subfactor under the Solicitation's most important evaluation factor, Site Location. BOP did not even mention Bannum's failure to proffer the Conditional Use permit, a mandatory minimum requirement of the Solicitation in one of the Solicitation's most critical areas.

BOP's failure to conduct a price/technical tradeoff and its failure to make a rational award determination prejudiced Dismas. Had BOP properly conducted its price/technical tradeoff or, at the very least, conducted a rational analysis of whether Bannum met the minimum requirements of the Solicitation, Dismas would likely have received award of the Contract.

**B. Absent Temporary or Preliminary Injunctive Relief, Dismas Will Suffer Irreparable Harm**

The second factor the Court must consider before awarding preliminary injunctive relief is whether the plaintiff will suffer irreparable harm in the absence of injunctive relief. *See, e.g., PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004). Irreparable harm is harm for which the plaintiff has no other adequate remedy. *See, e.g., Info. Scis Corp. v. United States,* 2006 U.S. Claims LEXIS 274 at 185-86 (2006) ("[w]hen assessing irreparable injury, the relevant inquiry in weighing this factor is whether the protesters have an adequate remedy, in the absence of an injunction") (citing *OTI America, Inc. v. United States,* 68 Fed. Cl. 646, 659 (2005); *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 743 (2000)).

This Court has held that a protestor suffers irreparable injury when it has been deprived of the opportunity to compete with other offerors on a level playing field, which no legal remedy can adequately redress. *See Info. Scis.*, 2006 U.S. Claims LEXIS 274 at 186 (citing, *inter alia, Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004)); *see also SAI Indus. v.*

*United States*, 60 Fed. Cl. 731, 747 (2004) ("Irreparable injury can be shown in the form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom.") (citation and internal quotation omitted).

Here, BOP's irrational evaluation tilted the evaluation field in favor of Bannum, thereby unfairly depriving Dismas of the opportunity to compete for the Contract. [redacted]

Potential loss of work, however, is not the only cognizable harm. There is also the competitive harm to the protestor [redacted]. *See CIGNA Government Services, LLC v. United States*, 70 Fed. Cl. 100, 101-02 (2006).

Here, where BOP has improperly bestowed the Contract ([redacted]) on Bannum, should Bannum be permitted to proceed with contract performance, Dismas faces the prospect of substantial injury in the form of [redacted]. Absent injunctive relief, [redacted] from this protest.

**C. The Balance of Hardships Favors Dismas**

The third consideration for the Court is the balance of hardships. *See, e.g., Info. Scis.*, 2006 U.S. Claims LEXIS 274 at 188 (citing *PGBA*, 389 F.3d at 1229). Here, the harm to Plaintiff Dismas easily outweighs any harm to BOP and Bannum. Injunctive relief will [redacted]. In fact, a [redacted].

Accordingly, the balance of hardships tilts in Dismas's favor here.

### D. Injunctive Relief Will Serve the Public's Interest in Proper Enforcement of Procurement Laws

The final consideration is whether injunctive relief is in the public interest. *See, e.g., Info. Scis.*, 2006 U.S. Claims LEXIS 274 at 189 (citing *PGBA*, 389 F.3d at 1229). It is well-established that the public interest is served by requiring government officials to follow procurement statutes and regulations. *Id.* (citing *LABAT-Anderson v. United States*, 65 Fed. Cl. 570, 581 (2005)) (other citations omitted). Here, given the critical, quasi-governmental nature of the services to be provided under the Contract, i.e., the care and custody of federal offenders, the public interest is especially well-served by ensuring that the ultimate awardee represents the "best value" under the evaluation and source selection factors set forth in the RFP.

The public interest will also be served by avoiding an unnecessary transition in service providers and the associated potential for interruptions in service during the pendency of this protest, should Dismas prevail. In addition, as stated previously, unlike Bannum, which lacks a facility, Dismas is ready to perform the Contract.

## CONCLUSION AND RELIEF REQUESTED

Because the procuring agency's decision to award the contract to Bannum resulted from irrational evaluations of the offerors' proposals and an unlawful source selection decision, Dismas is likely to prevail on the merits. Absent injunctive relief, Dismas will suffer irreparable harm if BOP permits Bannum to proceed with contract performance. In contrast, injunctive relief would cause no harm to the Government, [redacted]

Accordingly, Dismas respectfully requests that this Court issue a preliminary injunction prohibiting the procuring agency, BOP, from permitting Bannum to proceed with contract performance pending the final resolution of this case on the merits.

Dated: December 4, 2006

Respectfully submitted,

Alex D. Tomaszczuk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7940
Fax: (703) 770-7901

*Counsel of Record for Plaintiff*
*Dismas Charities, Inc.*

*Of Counsel:*

Daniel S. Herzfeld
Orest J. Jowyk
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102
Tel: (703) 770-7900

**EXHIBITS**

(Redacted)